UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 19-12496-RGS

AMALGAMATED TITANIUM INTERNATIONAL CORP.
and DAVID LAMOUREUX

v.

MENNIE MACHINE COMPANY d/b/a MMC ARMORY

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

January 18, 2022

STEARNS, D.J.

This is a case arising from an alleged breach of a joint venture agreement between two companies – Amalgamated Titanium International Corp. and Mennie Machine Company (MMC) – to produce, market, and distribute firearms and firearms parts. Amalgamated Titanium, together with its founder and CEO David Lamoureux (collectively, ATI), sued MMC alleging, *inter alia*, breach of contract, conversion, defamation, and unfair and deceptive business practices. After the close of discovery, MMC moved for summary judgment, claiming that ATI's claims lack factual support.

After careful review of the record and the parties' briefs, the court will allow-in-part and deny-in-part MMC's motion.

## BACKGROUND

In March of 2014, Lamoureux met MMC's president, Bill Mennie, while attending an electro-magnetic pulse seminar in Florida. *See* MMC Statement of Facts (MSF) (Dkt # 54) ¶¶ 16, 20; ATI Opp'n to MSF (AOMSF) (Dkt # 67) ¶ 20.  On March 27, 2014, Lamoureux contacted Bill Mennie and broached the possibility of collaboration between their two companies. MSF ¶ 21; AOMSF ¶ 21.  The following day, MMC executed a one-year nondisclosure and noncompetition agreement with ATI reciting that "[t]he Parties are in discussions and working with each other, in connection with conducting business together."  ATI Ex. App. (Dkt # 68) Ex. C-1.  On May 5, 2014, Lamoureux met with Bill Mennie and his brother David in Chicago to discuss the joint production of shotgun barrels, rifle barrels, and a fully assembled rifle.  MSF ¶ 22; AOMSF ¶ 22.

On August 19, 2014, Lamoureux sent an email to Bill Mennie and MMC CFO Gary Hegland, which included a proposed profit-sharing agreement between ATI and MMC.  MSF Ex. 24.  Lamoureux stressed in the proposal that he and Bill Mennie would "need to get 2 agreements signed" – namely, a ten-year nondisclosure/noncompete agreement and a profit-sharing

partnership agreement. *Id.* On November 28, 2014, MMC executed the ten-year nondisclosure/noncompete agreement. ATI Ex. D-1 at 2. ATI and MMC never signed a written partnership or joint venture agreement. MSF ¶ 40; AOMSF ¶ 40.

On January 25, 2016, Lamoureux emailed Bill and David Mennie stating that Vic Vance, MMC's gun salesman, was creating "sales estimates for the titanium guns" and that when those projections were complete, Bill Mennie "can prepare a P.O. [purchase order] for [ATI] as discussed." MSF ¶ 58; AOMSF ¶¶ 58, 58a; MSF Ex. 38. In response, Bill Mennie stated that he was "confused" about the P.O., to which Lamoureux replied: "It's similar to what we did with Remington but we can discuss it when I call today." MSF Ex. 39. Lamoureux testified in his deposition that ATI had an unsigned purchase order with Remington. MSF Ex. 7 at 416:11-417:23.

On March 7, 2016, Lamoureux sent Bill Mennie an email entitled "Paperwork and signature for Amalgamated," which stated: "Bill, [h]ere is the paperwork that we discussed that I need your signature on for my banking relationships to show that we are doing business together. I would greatly appreciate getting it back asap." MSF Ex. 40 at 1. The email included an attached document on MMC Armory letterhead entitled "Titanium Arms Products for FALL 2016 Delivery," which was backdated to February 20,

2016, and purportedly addressed to ATI.  *Id.* at 2.  The document, which refers to itself as a "Purchase Order" on its second page, contains order amounts, prices (totaling $34,752,956.52), and estimated payment dates for "Remington 870 Barrels (Pump Action)," "Mossberg 500 Barrels (Pump Action)," "MMC Armory Shotgun[s] (Pump Action)," "AR 15 - PARTS," and "AR 15 - RIFLES."  *Id.* at 3.  The final page of the document stated that delivery would take place between September and December of 2016; it also contained an unsigned signature block bearing Bill Mennie's name.  *Id.* at 4.  Later that day, Bill Mennie emailed Lamoureux a signed version of the document, with the caveat that "[t]he above volumes are projections and subject to change without notice."  MSF Ex. 41 at 1, 4.  Thereafter, MMC accepted shipments of ATI's titanium.  AOMSF ¶ 77d.

On October 12, 2016, Hegland emailed Lamoureux, stating that MMC's "bank auditor found the Amalgamated/Meridian & Invoices/Payments and is citing [MMC] for being out of compliance with our bank covenants."  ATI Ex. C-8.  Hegland died before he could be deposed in this case, but it appears from the record that there never was a bank audit or covenant violation.  ATI Ex. D at 104:6-106:1, 111:6-19, 130:19-131:11.  On October 21, 2016, MMC sent Lamoureux a letter terminating its business relationship with ATI.  ATI Ex. C-9.  The termination letter also stated that MMC was "prepared to

return the consigned Titanium Raw Material to ATI upon ATI's execution of the appropriate paperwork." *Id.* The paperwork in question was a waiver and release of "any and all claims, demands and causes of action that [ATI] now ha[s] or might have against" MMC. ATI Ex. G.

On October 25, 2016, ATI requested that MMC's counsel verify and itemize all titanium deliveries – as well as their condition and state of manufacture – in MMC's possession. ATI Ex. D-5. MMC has yet to do so. ATI Ex. D at 52:7-13, 196:6-12. According to an inventory compiled from ATI's records, MMC held at least $637,704.31 of ATI's titanium as of September of 2016. *See* ATI Ex. B-2; AOMSF ¶ 77d. Thereafter, either in December of 2016 or January of 2017, ATI made an additional oral demand for the return of the titanium during a conference call with MMC. ATI Ex. A at 248:4-249:19. To date, MMC has not withdrawn its requirement that ATI sign a release, ATI has not signed a release, and ATI's titanium has not been returned. *See* ATI Ex. D at 212:11-20.

On November 3, 2016, MMC's outside counsel, Lane Moyer, spoke by telephone with Tim Irish, an employee of Meridian, one of ATI's financial backers. MSF ¶ 97; AOMSF ¶ 97.[1] According to Irish, Moyer told him that

---

[1] At the time of the call, Moyer was in Illinois and Irish was in California. MSF ¶ 98.

Bill Mennie "did not sign [the] purchase order, there was not a valid purchase order between . . . MMC and [ATI] and . . . that he didn't know how that signature got on that document and alluded to [Irish] that maybe David Lamoureux signed that document." ATI Ex. E at 51:13-21. Irish testified that he reported what Moyer had told him to the other investment groups backing ATI. *Id.* at 41:24-42:10. As a result, several companies that had expressed interest in investing in ATI chose not to go forward, and Meridian shut off its financing to ATI. *Id.* at 48:20-50:3.[2] ATI initiated this lawsuit against MMC on October 21, 2019. *See* Not. of Removal (Dkt # 1) at 20.

## DISCUSSION

"Summary judgment is warranted if the record, construed in the light most flattering to the nonmovant, 'presents no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law.'" *Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9, 21 (1st Cir. 2018), quoting *McKenney v. Mangino*, 873 F.3d 75, 80 (1st Cir. 2017). The moving party "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record]

---

[2] On November 8, 2016, Irish emailed Lamoureux, stating that he had been "told that Bill Mennie didn't execute [the] PO and that his signature is fabricated," and asking for proof that MMC had in fact executed the document. MSF Ex. 60 at 1. Shortly thereafter, Lamoureux responded with a copy of Bill Mennie's email forwarding the signed purchase order. *Id.*

which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   If this is accomplished, the burden then "shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the nonmoving party." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990).   The nonmoving party "must adduce specific, provable facts demonstrating that there is a triable issue." *Id.* (internal quotation marks omitted).   "A 'genuine' issue of 'material fact' only exists 'if a reasonable factfinder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor.'" *Town of Westport v. Monsanto Co.*, 877 F.3d 58, 64-65 (1st Cir. 2017), quoting *Cortés-Irizarry v. Corporación Insular de Seguros*, 111 F.3d 184, 187 (1st Cir. 1997).   The non-moving party cannot "rest[] merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

Because the court's subject matter jurisdiction is based on diversity of citizenship, Massachusetts choice-of-law principles apply.   *See Reicher v. Berkshire Life Ins. Co. of Am.*, 360 F.3d 1, 5 (1st Cir. 2004).   "Massachusetts courts take a flexible interest-based approach to conflict of laws issues and

will consider a wide variety of factors in choosing the applicable law," including "(1) the needs of the interstate and international legal regimes; (2) the policies of the forum; (3) the policies of other interested jurisdictions; (4) the protection of justified expectations; (5) the basic policies underlying the particular field of law; (6) certainty, predictability, and uniformity of result; and (7) ease of applicability." *Millipore Corp. v. Travelers Indem. Co.*, 115 F.3d 21, 30 (1st Cir. 1997).

*(1) Joint Venture Agreement*

      *Count I – Breach of Contract*

MMC first argues that any action based on an alleged oral joint venture agreement between MMC and ATI is precluded by the Statute of Frauds.[3] ATI counters that the agreement is not within the Statute of Frauds because it could have been performed in one year. *See Boothby v. Texon, Inc.*, 414 Mass. 468, 479 (1993).

The agreement at issue was not on its face intended to be, nor could it have been, performed within one year. The profit-sharing joint venture

---

[3] Massachusetts General Laws ch. 259, § 1 (the Statute of Frauds), provides that no action can be brought concerning any agreement or contract "that is not to be performed within one year from the making thereof; [u]nless the promise, contract or agreement upon which such action is brought . . . is in writing and signed by the party to be charged therewith or by some person thereunto by him legally authorized."

agreement was allegedly entered in August of 2014.  *See* AOMSF ¶¶ 41-42.

Approximately one year later, on August 4, 2015, ATI emailed Bill Mennie

stating that it "hoped to make at least one rifle for [the] shot show" and

wanted to "have the rifle complete by October for testing."  MSF Ex. 37.  ATI

and MMC completed the demonstration rifle and displayed it at MMC's

booth at the "Shot Show" in January of 2016.  AOMSF ¶ 57a; ATI Ex. C-1.

Following the showing, on January 28, 2016, Lamoureux emailed Bill

Mennie to discuss the monthly production of a line of "Tactical AR15s,"

stressing the need for gun samples for testing and marketing.  MSF Ex. 39.

ATI offers no evidence suggesting that the extended joint venture agreement

could have been completed in a year.[4]

Accordingly, the agreement is within the Statute of Frauds and

unenforceable unless memorialized in a signed writing.[5]  *See Fichera v. City*

---

[4] ATI's contention that the agreement was "terminable at will" and therefore could have been revoked by either party within one year, Pls.' Opp'n (Dkt # 66) at 16, is a *non sequitur*, as terminability has no bearing on the issue of the length of time needed to "perform" the contract.

[5] ATI makes two additional arguments, neither of which have any immediate pertinence: (1) that a joint venture agreement need not be in writing to be enforceable, and (2) that MMC's partial performance of the agreement negates the application of the Statute of Frauds.  While it is true that a joint venture may be created by an oral agreement, *see Pray v. SMPO Props, Inc.*, 746 F. Supp. 2d 317, 321 (D. Mass. 2010), that has no bearing on the operation of the Statute of Frauds. The case that ATI relies upon for its partial performance argument – *Brewster Wallcovering Co. v. Blue*

*of Lawrence*, 312 Mass. 287, 288 (1942).  The written memorandum must "(1) reasonably identify the subject matter of the contract, (2) indicate that a contract with respect to the subject matter has been made between the parties, (3) state with reasonable certainty the essential terms of the unperformed promises in the contract, and (4) be signed by or on behalf of the party to be charged."  *Trenwick Am. Reinsurance Corp. v. IRC, Inc.*, 764 F. Supp. 2d 274, 298-299 (D. Mass. 2011).[6]

ATI maintains that Lamoureux's memorandum to MMC outlining the proposed terms of the joint venture, MSF Ex. 24, read together with the purchase order signed by Bill Mennie, MSF Ex. 41, "sufficiently recognize the existence of the oral joint venture agreement."  Pls.' Opp'n at 17. Lamoureux's memorandum, however, repeatedly describes its terms as no more than what they were: a proposal.  MSF Ex. 24 at 3-4.  *See Lafayette Place Assocs. v. Bos. Redevelopment Auth.*, 427 Mass. 509, 517-518 (1998)

---

*Mountain Wallcoverings Inc.*, 77 Mass. App. Ct. 582 (2007) – is inapposite as the case involved a sale of goods governed by the Massachusetts Uniform Commercial Code.  *Id.* at 600.  In the non-UCC context, Massachusetts courts have "repeatedly reaffirmed" that "performance, even if full, does not remove a contract from the operation of" the Statute of Frauds.  *See Meng v. Trs. of Bos. Univ.*, 44 Mass. App. Ct. 650, 653 (1998); *see also DeMontague v. Bacharach*, 187 Mass. 128, 134 (1905).

[6] "[M]ultiple documents pertinent to a transaction may be read together in determining whether the statute of frauds has been satisfied." *Blackstone Realty LLC v. F.D.I.C.*, 244 F.3d 193, 198 n.4 (1st Cir. 2001).

(no binding agreement found to exist "where parties have merely reached the stage of 'imperfect negotiation' prior to formalizing a contract") (internal citation omitted). Bill Mennie's signature on the purchase order adds nothing to the exegesis. The purchase order states terms for the manufacture and delivery of a quantity of firearms and firearm parts; it says nothing about a collaboration between ATI and MMC in the manufacture of the goods, or any sharing of the profits. "It is axiomatic that to create an enforceable contract, there must be an agreement between the parties on the material terms of that contract . . . ." *Situation Mgmt. Sys., Inc. v. Malouf, Inc.*, 430 Mass. 875, 878 (2000). While "[i]t is not required that all terms of the agreement be precisely specified . . . [t]he parties must, however, have progressed beyond the stage of 'imperfect negotiation.'" *Id.* (internal citation omitted). The alleged joint venture thus fails as an inchoate agreement insufficient to satisfy the Statute of Frauds.

*Count II – Promissory Estoppel*

MMC further contends that ATI's alternative promissory estoppel claim fails for want of an unambiguous promise by MMC to enter a joint venture agreement.

> To prove a claim of promissory estoppel under Massachusetts law, "a plaintiff must allege that (1) a promisor makes a promise which he should have reasonably expected to induce action or forbearance of a definite or substantial character on the part of

the promisee, (2) the promise does induce such action or forbearance, and (3) injustice can be avoided only by enforcement of the promise."

*Neuhoff v. Marvin Lumber and Cedar Co.*, 370 F.3d 197, 203 (1st Cir. 2004), quoting *Carroll v. Xerox Corp.*, 294 F.3d 231, 242 (1st Cir. 2002); *see also Upton v. JWP Businessland*, 425 Mass. 756, 760 (1997) (the promise must be "unambiguous"). "[A]n action based on reliance is equivalent to a contract action, and the party bringing such an action must prove all the necessary elements of a contract other than consideration." *R.I. Hosp. Trust Nat'l Bank v. Varadian*, 419 Mass. 841, 850 (1995).

The court agrees with MMC that ATI has not shown that MMC made any unambiguous promise about a profit-sharing venture. The conclusory allegation that "ATI and MMC began operating under the profit-sharing agreement," Pls.' Opp'n at 24, does not suffice. A promise that is made with "an understood intention that it is not to be legally binding" is not a contract, and no amount of reliance on the part of the promisee will make it so. *Varadian*, 419 Mass. at 850.[7]

*(2) Purchase Order*

---

[7] While the reasonableness of a party's reliance on a promise of another is often a question of fact, it can be one of law, particularly where, as here, the parties involved are of relatively equal knowledge and sophistication. *See Cataldo Ambulance Serv., Inc. v. Chelsea*, 426 Mass. 383, 387 (1998).

*Count III – Breach of Contract*

MMC argues that the purchase order signed by Bill Mennie did not create an enforceable contract because: (1) the document had no binding terms; (2) ATI could not legally sell firearms or firearm parts; and (3) the sole purpose of the purchase order was to satisfy ATI's banking relationships.

MMC first contends that because the purchase order states that the "volumes are projections and subject to change without notice," MSF Ex. 41 at 4, the terms are conditional and therefore not binding.  MMC looks to *Kuwaiti Danish Computer, Co. v. Digital Equipment Corp.*, 438 Mass. 459 (2003), in which the Massachusetts Supreme Judicial Court found that the "qualifying language [in the RFP] . . . look[ed] toward some future contract," and did "not evidence an existing contract." *Id.* at 465.  In *Kuwaiti Danish*, however, the RFP clearly stated that it was an "invitation to offer only" and that "[a]ny contract resulting from the quotation must be accepted . . . by a duly authorized representative." *Id.* at 464.

Here, by contrast, there is no language pointing to the possibility of a future contract.  Rather, the purchase order sets out specific and quantifiable terms – including volume, price, and an estimated delivery window.  It is true that "[i]n some cases, the failure to reduce uncertainties to definite terms is fatal, particularly where parties have not yet formalized their negotiations or

13

have left essential terms completely open." *Lafayette Place Assocs.*, 427 Mass. at 517. However, once past "imperfect negotiations," courts apply the principle that, even "in the face of uncertainty," a contract "should be interpreted 'so as to make it a valid and enforceable undertaking rather than one of no force and effect.'" *Id.*, quoting *Shayeb v. Holland*, 321 Mass. 429, 432 (1947). "If parties specify formulae and procedures that, although contingent on future events, provide mechanisms to narrow present uncertainties to rights and obligations, their agreement is binding." *Id.* at 518. Here, while the quantity of firearms to be purchased was subject to change "without notice," the purchase order established a definitive formula for establishing the amount owing whatever the ultimate number. *Cf. Lawrence v. Cambridge*, 422 Mass. 406, 411 (1996) ("[I]n an ordinary contract, where matters are left open, the court may imply terms that are reasonable or that may be gathered from the subsequent course of performance.").

Second, MMC argues that ATI cannot enforce the contract because it does not have a federal firearms license and therefore could not legally sell firearms or firearm parts. MSF ¶ 5; AOMSF ¶ 5. According to ATI, however, its role "was providing the design, engineering, technology and management . . . [while] MMC was manufacturing and assembling the firearms and

firearm parts referenced in the Purchase Order." Pls.' Opp'n at 5, citing ATI Ex. B at 431:23-432:2, 436:5-8. Whether ATI's role in the production of the firearms, as it defines it, required federal licensure is a dispute of material fact that cannot be resolved on the existing record.

Finally, MMC contends that the purpose of the purchase order was to firm up ATI's banking relationships, not to create an enforceable contract. MMC points to Lamoureux's testimony that ATI executed a similar order with Remington that he agreed was "noncontractually binding but it show[ed] the two parties [were] committed to each other," MSF Ex. 7 at 416:11-417:23; and his comment that he needed Bill Mennie's signature on the purchase order "for my banking relationships to show we are doing business together." MSF Ex. 40 at 1. ATI, for its part, counters with Lamoureux's email to MMC stating that a purchase order would be accepted once Vic Vance compiled a firearms sales estimate, MSF Ex. 39 at 3; Bill Mennie's assurance to Meridian that the purchase order invoices issued under were valid, ATI Ex. C-10; and MMC's acceptance of ATI's titanium, MSF ¶¶ 83-85. On this record, there is a genuine dispute of fact as to the parties' intentions in executing the purchase order. *See Lawless, LLC*, 894 F.3d at 21.

*Count V – Promissory Estoppel*

15

Concerning ATI's alternative promissory estoppel claim, there is a genuine dispute of material fact as to whether "all the necessary elements of a contract other than consideration" are present in the executed purchase order. *Varadian*, 419 Mass. at 850. Moreover, ATI has demonstrated the existence of a triable issue as to whether (1) MMC made a promise to perform pursuant to the purchase order that it reasonably should have expected would induce action on ATI's part, (2) ATI was in fact induced to act by delivering its titanium to MMC, and (3) injustice can only be avoided by enforcement of MMC's promise. *See Neuhoff*, 370 F.3d at 203.

### *Count IX – Implied Covenant of Good Faith and Fair Dealing*

MMC first contends that ATI's claim of a breach of the covenant of good faith and fair dealing fails because Illinois – as the state with the most significant relationship to the contract – does not allow an alleged breach to be prosecuted as an independent cause of action. Alternatively, MMC contends that the claim fails under Massachusetts law because ATI has failed to produce evidence that MMC acted with an improper motive in refusing to honor the disputed purchase order.

"It is a fundamental choice of law principle that only actual conflicts between the laws of different jurisdictions must be resolved." *Kaufman v. Richmond*, 442 Mass. 1010, 1011 (2004). Such is the case here, where an

"actual conflict" exists between the laws of Massachusetts and those of Illinois. *Compare Robert and Ardis James Found. v. Meyers*, 474 Mass. 181, 188 (2016) ("[E]very contract in Massachusetts is subject to an implied covenant of good faith and fair dealing."), *with McArdle v. Peoria Sch. Dist. No. 150*, 705 F.3d 751, 755 (7th Cir. 2013) ("The obligation of good faith and fair dealing is used as an aid in construing a contract under Illinois law, but does not create an independent cause of action.").

In resolving conflicts of law, Massachusetts follows the "functional" approach of Restatement (Second) of Conflict of Laws § 142 (1971). *See Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 631 (1985). Under this approach, a court will apply a "most-significant relationship" test to the parties and the dispute unless no substantial interest of the forum would be served by maintenance of the action. *Nierman v. Hyatt Corp.*, 441 Mass. 693, 697-698 (2004) (Texas law governed where the locus of the accident was in Texas, where the nonresident hotel corporation operated the premises and where its alleged tortfeasor employee lived).

Here the parties had every reason to anticipate that any contractual dispute arising from their mutual dealings would be governed by Massachusetts law. MMC knew at the outset that Lamoureux was a Massachusetts resident and that ATI had its principal (and only) place of

business in Massachusetts.  The ten-year noncompete and nondisclosure agreement that MMC executed with ATI explicitly stated that the agreement "will be construed, interpreted, and applied in accordance with the laws of the State of Massachusetts." ATI Ex. D-1 at 2.  Finally, because "a claim for a breach of that duty [of good faith and fair dealing] sounds in contract rather than in tort," choice-of-law principles will as a rule dictate that "the same substantive law that governs the contract claim also governs the implied covenant claim." *Crellin Techs., Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 10 (1st Cir. 1994).  In sum, Massachusetts law applies.  *See Millipore Corp.*, 115 F.3d at 30.[8]

Under Massachusetts law, "[e]very contract implies good faith and fair dealing between the parties to it." *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471 (1991).  The covenant requires that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract." *Id.* at 471-472.  A breach of the

---

[8] This outcome also comports with Massachusetts's stronger policy interest of utilizing the implied covenant of good faith and fair dealing as an independent method of enforcing a contract's objectives, *see Meyers*, 474 Mass. at 189 ("The covenant 'exists so that the objectives of the contract may be realized.'"), over Illinois's policy of merely using the covenant as a method of interpretation, *see In re Vtech Data Breach Litig.*, 2017 WL 2880102, at *9 (N.D. Ill. July 5, 2017) ("The implied covenant is used to interpret a contract.").

covenant occurs when one party violates the reasonable expectations of the other. *See Weiler v. PortfolioScope, Inc.*, 469 Mass. 75, 82 (2014). To prove a violation, there is no requirement that bad faith be shown; instead, the plaintiff has the burden of proving a lack of good faith. *See Meyers*, 474 Mass. at 189, 191. Want of good faith "carries an implication of a dishonest purpose, conscious doing of wrong, or breach of a duty through motive of self-interest or ill will." *Schwanbeck v. Fed. Mogul Corp.*, 31 Mass. App. Ct. 390, 404 (1991).

ATI points to three pieces of evidence that it maintains demonstrate MMC's absence of good faith: (1) MMC's CFO Gary Hegland's apparent lie to ATI regarding non-extant issues with a bank audit, ATI Ex. C-8; (2) the false insinuation by MMC's counsel, Lane Moyer, to Meridian that Lamoureux had forged Bill Mennie's signature on the purchase order, ATI Ex. E at 51:13-21; and (3) MMC's refusal to return ATI's titanium unless ATI executed an exonerating waiver, ATI Ex. G. The first two items cited by ATI, the fictitious bank audit and the alleged forged signature – which, if true, may reflect dishonest dealings on the part of MMC – had no bearing on "the fruits of the contract." *HBC Assocs.*, 411 Mass. at 471. Statements made before the formation of a contract or after its termination will not support an action for a breach of the covenant. *See Accusoft Corp. v. Palo*, 237 F.3d 31, 45 (1st Cir.

2001); *see also Uno Rests., Inc. v. Bos. Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004) (the implied covenant cannot "create rights and duties not otherwise provided for in the existing contractual relationship").

However, MMC's holding of ATI's titanium as a hostage unless ATI agreed to grant MMC a blanket waiver of immunity from contractual liability is another matter. "[A] reasonable factfinder, examining the evidence and drawing all reasonable inferences helpful to" ATI, could conclude that MMC's refusal to return ATI's titanium without the waiver amounted to an extortionate act inconsistent with its obligation to deal with ATI in good faith. *Cortés-Irizarry*, 111 F.3d at 187. Accordingly, ATI has shown the existence of a triable issue of fact as to whether MMC breached the covenant of good faith and fair dealing.

*(3) Count IV – Conversion*

MMC maintains that ATI's claim alleging conversion of the titanium is unavailing because ATI abandoned the property.[9] The court disagrees.

---

[9] MMC also argues that the claim fails because ATI failed to submit any proof of the titanium's market value at the time of the alleged conversion. *See, e.g.*, *Manhattan Clothing Co. v. Goldberg*, 322 Mass. 472, 475 (1948) ("[T]he plaintiff ordinarily is entitled to recover the fair and reasonable market value of the property with interest from the time of conversion."). However, ATI has submitted evidence that the titanium in MMC's possession was worth approximately $637,704.31 as of September of 2016. *See* ATI Ex. B-2. ATI might have been able to provide a more precise accounting of the titanium's true market value at the time of conversion had MMC not refused

"Conversion is the wrongful dominion or control over the personal property . . . of another." *In re Halmar Distribs., Inc.*, 232 B.R. 18, 22 (Bankr. D. Mass. 1999).   Conversion requires proof that a defendant intentionally or wrongfully exercised acts of ownership, dominion, or control over personal property to which he has no right of possession; and thereby deprived the rightful owner of its use and enjoyment.   *See In the Matter of Hilson*, 448 Mass. 603, 611 (2007).

There is no credible evidence presented by MMC suggesting that ATI abandoned the titanium.   To the contrary, ATI requested an inventory and twice demanded its return (MMC does not contest ATI's ownership of the titanium).   Having been told by MMC that the titanium would not be returned unless it executed a waiver absolving MMC of all liability, ATI could reasonably have concluded that any further demand for the return of the titanium would have been an exercise in futility.[10]

*(4) Counts VII and VIII – Defamation*

---

to provide ATI with an inventory of the titanium deliveries (including their condition and state of manufacture).  *See* ATI Ex. D-5.

[10] MMC's post-litigation-onset statement to ATI – that the titanium is now "available for pickup by [ATI] or [its] designee," *see* MSF Ex. 51 at 6, does not absolve MMC of the conversion, nor does ATI now have to accept the return of the titanium.  *See George v. Coolidge Bank & Tr.*, 360 Mass. 635, 641 (1971).

Counts VII and VIII of the Complaint allege that MMC defamed ATI when MMC's attorney, Lane Moyer, falsely insinuated to Meridian's Tim Irish that Lamoureux had forged Bill Mennie's signature on the purchase order.  MMC challenges ATI's defamation claims on three grounds: (a) the claims are time-barred by California's (or Illinois's) statute of limitations, (b) Moyer's statements are protected by the litigation privilege, and (c) ATI's reputation was not harmed by the statements.  The court will discuss each contention in turn.

### (a) Statute of Limitations

MMC argues that Illinois and California – which have one-year statutes of limitations for defamation claims – have more significant relationships to the events surrounding the alleged defamation than does Massachusetts – which has a three-year defamation statute of limitations. Massachusetts will generally apply its own statute of limitations "to permit a claim unless: '(a) maintenance of the claim would serve no substantial interest of the forum; and (b) the claim would be barred under the statute of limitations of a state having a more significant relationship to the parties and the occurrence.'" *Nierman*, 441 Mass. at 696, quoting Restatement (Second) of Conflict of Laws § 142.  Thus, "the forum should not entertain a claim when doing so would not advance any local interest and would frustrate the policy

of a state with a closer connection with the case and whose statute of limitations would bar the case." *New England Tel. & Tel. Co. v. Gourdeau Constr. Co.*, 419 Mass. 658, 611 (1995).

California's sole connection to the defamation resides in the fact that Irish was in California when Moyer relayed the allegedly defamatory statement over the telephone.  By contrast, Lamoureux was, at all relevant times, a Massachusetts resident; ATI is a Massachusetts-based business; and almost all of ATI's actions relating to the events at hand took place in Massachusetts.  Illinois's presence is a closer issue, given that MMC is an Illinois-based company, the initial meeting between the principals of MMC and ATI took place in Chicago, and Moyer was in Illinois when he made the call to Irish.  That said, while it is undisputed that the defamatory statements were made and received in Illinois and California, any harm done to ATI's business relationships and reputations would have been felt in Massachusetts.  Although Massachusetts has only a "general interest in having its residents compensated for personal injuries suffered in another State," *Nierman*, 441 Mass. at 697, it has a compelling interest in seeing its residents compensated for out-of-state torts that have a direct and tangible in-state impact.  Thus, the claims are timely pursuant to Massachusetts law.

*(b) Litigation Privilege*

MMC next contends that Moyer's statements are protected by the litigation privilege.  This privilege applies "where such statements are made by an attorney engaged in his function as an attorney whether in the institution or conduct of litigation or in conferences and other communications preliminary to litigation." *Sriberg v. Raymond*, 370 Mass. 105, 109 (1976).  However, the privilege "may not be exploited as an opportunity to defame with impunity, and it does not protect unnecessary or unreasonable publication to parties outside the litigation." *Riverdale Mills Corp. v. Cavatorta N. Am. Inc.*, 189 F. Supp. 3d 317, 321 (D. Mass. 2016). "The application of the privilege 'is determined on a case-by-case basis [by the court], after a fact-specific analysis.'" *Id.*, quoting *Mack v. Wells Fargo Bank, N.A.*, 88 Mass. App. Ct. 664, 668 (2015).

On the existing record, the court concludes that the litigation privilege does not shield Moyer's statements.  Although ATI had entertained the idea of a lawsuit if the dispute with MMC could not be resolved amicably, *see* MSF ¶ 96; MSF Ex. 56, MMC offers no valid reason related to litigation that would justify Moyer's allegedly slanderous statements to a representative of Meridian – an entity with no role in any potential litigation between MMC and ATI concerning the failed joint venture.  On the other hand, Moyer would have been aware that if Meridian were to give credence to the allegation that

Lamoureux had forged a critical financial document, it would have a deleterious impact on ATI's capitalization. As such, "the need for unbridled advocacy [was] diminished, and the need to protect the intrusion upon [ATI's] reputation [was] enhanced." *Riverdale Mills Corp.*, 189 F. Supp. 3d at 322, quoting *Encompass Ins. Co. of Mass. v. Giampa*, 522 F. Supp. 2d 300, 309 (D. Mass. 2007).

*(c) Harm to ATI's Reputation*

Finally, MMC contends that ATI cannot demonstrate that the statements caused it any economic harm. To withstand summary judgment on a claim of defamation, a plaintiff must show that:

> (a) [t]he defendant made a statement, concerning the plaintiff, to a third party[;] . . . (b) [t]he statement could damage the plaintiff's reputation in the community[;] . . . (c) [t]he defendant was at fault in making the statement[;] . . . [and] (d) [t]he statement either caused the plaintiff economic loss (traditionally referred to as "special damages" or "special harm"), or is actionable without proof of economic loss.

*Ravnikar v. Bogojavlensky*, 438 Mass. 627, 629-630 (2003). A statement "that may prejudice the plaintiff's profession or business" is, as a rule, actionable without proof of economic loss. *Id.* at 630, citing *Lynch v. Lyons*, 303 Mass. 116, 118-119 (1939). "A statement falls within this exception to the economic harm requirement if it alleges that the plaintiff lacks a necessary characteristic of the profession." *Id.* at 631.

Here, the parties' dispute hinges on the fourth element.  MMC contends that because Moyer did not use the words "forged" or "fraudulent," his statements are not actionable without proof of economic loss.  However, Massachusetts law does not require the use of "magic" words to fall within the exception to the economic harm requirement – rather, the statement is actionable if "the words spoken . . . are fairly susceptible of the meaning that the plaintiff committed [the action charged], and that they would be so interpreted by reasonable men." *Lynch*, 303 Mass. at 122.  A reasonable factfinder, construing the record in the light most favorable to ATI, could conclude that Moyer's statements could fairly be interpreted to insinuate that ATI lacks "a necessary characteristic of the profession" – namely, honesty and transparency in its dealings with potential business partners. *Ravnikar*, 438 Mass. at 630.  Thus, there is a genuine dispute of material fact as to whether Moyer's statements are actionable without proof of economic loss.[11]

*(5) Count X – Mass. Gen. Laws 93A, § 11*

---

[11] In any event, ATI has submitted evidence from which a reasonable jury could conclude that ATI has suffered economic loss – that is, Irish's testimony that Meridian stopped providing financing for ATI after Moyer's call.  ATI Ex. E at 48:20-50:3.

ATI's claim that MMC violated Mass. Gen. Laws 93A, § 11 – by stealing ATI's specialized and proprietary titanium technology – fails because ATI cannot show that MMC's alleged misconduct occurred primarily and substantially within Massachusetts. *See* Mass. Gen. Laws 93A, § 11 (plaintiff must demonstrate that "the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth").   In determining whether the actions occurred primarily and substantially in Massachusetts, courts consider (1) "where the defendant committed the deceptive or unfair acts or practices," (2) "where the defendant received and acted upon the deceptive or unfair statements," and (3) "the situs of the plaintiff's losses due to the unfair or deceptive acts or practices." *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 834 F. Supp. 477, 487 (D. Mass. 1992), quoting *Clinton Hosp. Ass'n v. Corson Grp., Inc.*, 907 F.2d 1260, 1265-1266 (1st Cir. 1990).

Although the situs of ATI's losses, if any, would have occurred in Massachusetts, the gravitational center of MMC's alleged wrongdoing is firmly planted in Illinois.  MMC is an Illinois-based company, the titanium parts that ATI sent to MMC were received in Illinois, and any theft of ATI's

titanium technology would have occurred in Illinois.  Thus, ATI's Chapter 93A claim fails.

*(6) Count XI – Punitive Damages*

Punitive damages are not awarded under Massachusetts law unless authorized by statute.  *Flesner v. Tech. Comm'cns Corp.*, 410 Mass. 805, 813 (1991).  Because ATI is precluded from pursuing its Chapter 93A claim, there is no basis for a punitive damages award.


ORDER

For the foregoing reasons, MMC's motion for summary judgment is <u>ALLOWED</u> with prejudice as to Counts I, II, VI,[12] X, and XI.  MMC's motion is <u>DENIED</u> as to all other Counts.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

---

[12] ATI has agreed to voluntarily dismiss Count VI of its Complaint, which alleged tortious interference with prospective business relationships. *See* Pls.' Opp'n at 31.